# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
KAREN CRAWFORD,     *
    *
    Petitioner,     *     No. 17-398V
    *     Special Master Christian J. Moran
v.     *
    *
SECRETARY OF HEALTH     *     Filed: August 2, 2019
AND HUMAN SERVICES,     *
    *     Onset of shoulder pain, fact ruling
    Respondent.     *
* * * * * * * * * * * * * * * * * * * *

Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner;
Jeffrey T. Sprague, United States Dep't of Justice, Washington, DC, for respondent.

## UNPUBLISHED RULING FINDING FACTS[*]

       Karen Crawford filed a petition for compensation under the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10—34 (2012), alleging that she suffers from rheumatoid arthritis as a result of the influenza vaccine she received on October 13, 2014. Pet. at 1. The parties dispute when Ms. Crawford started to experience pain and swelling in her joints after the vaccination. For the reasons explained below, the undersigned finds that a preponderance of the evidence supports an onset date of January 5, 2015 for Ms. Crawford's symptoms.

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Anyone will be able to access this ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

## Procedural History

As support for her claim and the onset of her injury, Ms. Crawford filed affidavits and medical records. The Secretary filed a Rule 4(c) report that disputed Ms. Crawford's claim and the onset of her injury. In particular, the report points to the lack of support for Ms. Crawford's alleged onset of symptoms in the contemporaneously created medical records.

When special masters are confronted with discrepancies between medical records and affidavits, special masters are encouraged to hold hearings to evaluate the testimony of the affiants. See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006).

A fact hearing was held on June 22, 2018, during which Ms. Crawford and her husband, Ron Crawford, testified in person. After the hearing, Ms. Crawford submitted additional exhibits and moved for a Ruling on the Record. Each party then filed a memorandum in support of their positions. With these submissions, this matter is ripe for adjudication.

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the patient's medical issues. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people

see a doctor, they report all of their problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete. A notable example is Cucuras in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. Cucuras, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred." Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom

appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony. Cucuras, 993 F.2d at 1528. Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993). However, compelling oral testimony may be more persuasive than written records. Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records. An assessment of a

4

fact witness's credibility may involve consideration of the person's demeanor while testifying. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## **Factual Assertions**

The parties dispute the onset of Ms. Crawford's symptoms. Ms. Crawford and her husband offered testimony to supplement the medical records and support the rapid onset of Ms. Crawford's symptoms after receiving an influenza vaccine on October 13, 2014. The Secretary challenges the credibility of their testimony and points to the lack of corroboration for Ms. Crawford's alleged onset within the medical records and other contemporaneous evidence.

### Petitioner's Factual Assertions

Prior to receiving the vaccination, Ms. Crawford enjoyed relatively good health. Tr. 37. She only suffered from hyperthyroidism and had been treating with her endocrinologist, Dr. Samuel Dower, for the last 15 years. Tr. 23, 37. On October 10, 2014, Ms. Crawford saw an orthopedist, Dr. Evan Fischer, for pain in her right wrist. Exhibit 2 at 18. Ms. Crawford believed the wrist pain had originated in July from carrying her handbag incorrectly. Tr. 15. Three days later, on October 13, 2014, Ms. Crawford received the influenza vaccine at Family Health Center of Montclair. Exhibit 6 at 1.

Ms. Crawford testified that she immediately began suffering from left shoulder and arm pain. Tr. 13. By the time that she left the clinic, Ms. Crawford was feeling dizzy and her arm had started to swell. Id. When she arrived at home ten minutes later, she could not raise her left arm and the pain had spread to her neck. Id. Ms. Crawford immediately called Dr. Dower and he instructed her to stay hydrated and rest. Id. at 23-24.

Four days after receiving the vaccination, on October 17, 2014, Ms. Crawford sent a letter to the Family Health Center of Montclair stating that she was still experiencing an adverse reaction to the vaccine. Exhibit 18 at 1.

On October 20, 2014, Ms. Crawford filed a report with the Vaccine Adverse Event Reporting System (VAERS). Exhibit 11 at 2. Under adverse symptoms, Ms. Crawford listed that she was experiencing "[h]eadache, muscle pain, fever, neck pain, weakness, pain and itching at the site of injection, etc." Ms. Crawford

supplemented this report on December 4, 2014, via electronic mail. Exhibit 11 at 3. She listed additional reactions to the vaccine including "[an] extremely sore arm, muscles, from point of shot to shoulder, since date of shot." Id. Approximately nine months later, on September 13, 2015, Ms. Crawford filed another VAERS report that listed her adverse effects as swelling on arm at the site of injection, fever, nausea, joint pain, arms, legs, and flu-like symptoms. Exhibit 11 at 4. When accounting for the differences between the two reports, Ms. Crawford stated that in 2015 she was more familiar with the terminology and could better explain the symptoms she was feeling in 2014. Tr. 68.

On November 10, 2014, Ms. Crawford saw Dr. Fischer for her follow-up appointment regarding her right wrist pain. Exhibit 2 at 16. Dr. Fischer's records do not mention problems such as muscle pain or weakness but Ms. Crawford testified that was still experiencing left shoulder pain. Tr. 21. She did not report her shoulder pain to Dr. Fischer "[b]ecause he specializes in the hand." Id.

After her follow-up appointment with Dr. Fischer on November 10, 2014, Ms. Crawford did not see another doctor until January 12, 2015, when she saw Dr. Dower for her routine visit. Id. at 28. Ms. Crawford complained to Dr. Dower of pain in her left arm, shoulder, hip, knee, and foot, and neck. Id. at 29. Since receiving the influenza vaccine, Ms. Crawford testified that she was unable to go for her usual power walks and had trouble going up stairs. Id. at 44-45. She was also having difficulty brushing her teeth, washing her hair, and getting dressed. Exhibit 12 at 1-2. An avid cook, Ms. Crawford could no longer prepare meals for her family without significant help from Mr. Crawford. Tr. 143. Additionally, Ms. Crawford could no longer participate in her church choir as she had difficulty holding the choir books and sitting in pews. Exhibit 24 at 1.

On March 19, 2015, Ms. Crawford was diagnosed with rheumatoid arthritis by Dr. Henry McCabe. Exhibit 3 at 8. Ms. Crawford then began to see a rheumatologist, Dr. Stephen Paget. Tr. 34. She was prescribed Methotrexate and has since been able to manage her symptoms of rheumatoid arthritis. Id. 23.

## The Secretary's Challenges

The Secretary challenges several of Ms. Crawford's assertions by stressing the lack of evidence of left arm and shoulder pain immediately after the October 13, 2014 vaccination in her contemporaneously created medical records. The Secretary noted Ms. Crawford did not seek any medical care for almost a month after the vaccination for any symptoms relating to her vaccine. Resp't's Rep. at 9.

In her first medical appointment following the vaccination on November 10, 2014, Dr. Fischer stated in his review of symptoms "no muscle aches or weakness and no arthralgias/joint pain… swelling in the extremities" were present.  Exhibit 2 at 17. Her left arm and shoulder pain are not documented in her medical records until January 2015 in Dr. Dower's records.  Dr. Dower noted that Ms. Crawford complained of "[f]lu shot [illegible] then 1 [week] later pain [left] arm – still hurts."  Exhibit 5 at 20. The only documentary evidence of Ms. Crawford's pain between her vaccination and her appointment with Dr. Dower in January is the letter she sent to the Family Health Center of Montclair and her VAERS reports.

Furthermore, the Secretary maintains that Ms. Crawford was able to complete basic tasks in the months immediately following her vaccination by pointing to Ms. Crawford's posts on social media.  On December 5, 2014, Ms. Crawford posted to her Facebook page that she saw Peter Yarrow in concert. Exhibit 28 at 10.  In that month, she posted over eighty times to her Facebook page.  Id. at 1-13.  The Secretary also points to Ms. Crawford's Twitter account, where she tweeted about meals she had made in December 2014.  Exhibit 14 at 5.

## Discussion

As previously discussed, the inconsistency between contemporaneous medical records and a witness's testimony concerning symptoms can be explained in various ways.  La Londe, 110 Fed. Cl. at 203.  Although more explanations may exist, the four listed in La Londe provide a suitable framework for assessing this case.

In her testimony, Ms. Crawford pointed to two instances where she told a medical professional about her symptoms soon after her vaccination.  The first event was Ms. Crawford's call to Dr. Dower to report she "didn't feel well" immediately after returning home from receiving the flu vaccination.  Tr. 23-24. Ms. Crawford admitted that Dr. Dower did not have any records documenting that phone call.  Id. 24, 39; see exhibits 5 & 17.  In a letter summarizing the initial development of Ms. Crawford's injury, Dr. Dower did not mention this call from Ms. Crawford.[1]  Exhibit 7.  Ms. Crawford did not submit any phone records to corroborate this call to Dr. Dower.  Mr. Crawford's affidavit did not state that Ms. Crawford called Dr. Dower, or sought other medical treatment, immediately after the vaccination.  Exhibit 12.

---

[1] Dr. Dower's letter references one call from Ms. Crawford, but that call appears to have occurred after her January 2015 appointment with him.

7

The next event was Ms. Crawford's letter dated October 17, 2014, to Family Health Center. In the letter, Ms. Crawford stated that she had an "adverse reaction as a result of the being given the wrong vaccine," that she "still do[es] not feel well," and requested a receipt of the vaccination she had received. Exhibit 18. Exhibit 18 contains a handwritten note that the letter is a copy of the one mailed to Family Health Center.

The authenticity of this letter is questionable. Ms. Crawford's medical records from Family Health Center do not contain a copy of this letter, see exhibit 1, and no evidence indicates that this letter was received. The legal file from Ms. Crawford's original law firm did not contain a copy of this letter, and Ms. Crawford's current attorney was unaware of this letter at the time of the fact hearing. At the fact hearing, Ms. Crawford testified that she called Family Health Center to obtain a receipt of the vaccination and eventually Mr. Crawford went in person to Family Health Center to obtain the receipt. Tr. 24-25. In this context, Ms. Crawford did not testify that she sent a letter to Family Health Center.

After the fact hearing, Ms. Crawford submitted the October 17, 2014 letter as an exhibit. In support of the letter, Ms. Crawford attested that she had sent this letter to her original law firm in October 2016. Exhibit (affidavit) 32. Ms. Crawford submitted a screen shot of her computer showing that "Flu shot letter" (apparently the letter in question) was last modified on October 17, 2014. Exhibit 33. When given an opportunity to retain an expert in computer forensics who could have provided more information about when the file on Ms. Crawford's computer was created, the Secretary declined.

Ultimately, the undersigned accepts the authenticity of exhibit 18, largely because of the screen shot suggesting that this letter was created on the date shown on the letter, October 17, 2014, which was four days after vaccination. However, the October 17, 2014 letter states only that Ms. Crawford "still do[es] not feel well." Exhibit 18. The undersigned interprets "not feeling well" as referring to constitutional symptoms, such as headache, upset stomach, and/or general achiness. By way of contrast, "not feeling well" does not suggest a specific pain in one area of the body, such as a shoulder. Thus, exhibit 18 does not support Ms. Crawford's claim that she developed shoulder or joint pain in the days immediately following her vaccination.

While the call to Dr. Dower and the letter requesting her vaccination receipt are not well-supported by the evidence, even if the evidence firmly supported the

call and the letter, they are not sufficient evidence on their own to establish an onset of painful and swollen joints immediately following the vaccination on October 13, 2014.

Similarly, the VAERS reports and supplements are insufficient to establish that Ms. Crawford was suffering from shoulder symptoms and joint pain immediately following her vaccination. Her first VAERS report on October 20, 2014, contains no mention of joint symptoms. Exhibit 11 at 2. The supplemental report, sent on December 4, 2014, only alludes to muscle pain. Id. at 3.

Another primary inconsistency is between Ms. Crawford's failure to report her shoulder symptoms to Dr. Fischer on November 10, 2014, and her testimony that she had significant shoulder symptoms at that time. Ms. Crawford testified that she had "frozen shoulder" and was unable to raise or move her arm without excruciating pain. Tr. 26. She claims that she did not report her shoulder pain on November 10, 2014, to Dr. Fischer because she believed that he was only a "hand" doctor. Her failure to report symptoms outside a doctor's specialty is inconsistent with her previous behavior. Immediately following the vaccination, Ms. Crawford allegedly contacted Dr. Dower to discuss her symptoms. While Ms. Crawford had a long history of seeing Dr. Dower, he was an endocrinologist that, in following the same logic, would be unable to assist Ms. Crawford with her shoulder symptoms. It is more reasonable that a "hand specialist" or orthopedist would be consulted for shoulder pain before an endocrinologist.

There is no dispute that Ms. Crawford's symptoms eventually reached a point where they were debilitating and severely impacted her daily life. However, it is unlikely that she would have waited to report her symptoms until her routine appointment with Dr. Dower in January 2015 if she were truly having difficulty walking and performing daily tasks in the months immediately following her vaccination. When Ms. Crawford saw Dr. Fischer in early October 2014 for her wrist, she reported her pain to be near a four on a ten-point scale. Tr. 117. Ms. Crawford also actively sought a rheumatologist without a referral after her diagnosis. Tr. 34. These two examples prove that Ms. Crawford would generally not hesitate to seek medical attention if she was experiencing pain or discomfort and that she was engaged with the medical system. Thus, it would have been unusual for Ms. Crawford to wait two months to see Dr. Dower if she was having trouble walking and washing her hair.

Additionally, there are other inconsistencies between the evidence and testimony. Neither Mr. nor Ms. Crawford were able to state with certainty how

9

they celebrated Thanksgiving and Christmas in 2014.  Ms. Crawford's Twitter account shows that she was actively cooking fancy meals around Christmas and New Year's Eve.  Ms. Crawford's explanation that she posted her cooking activity on Twitter, without actually cooking at all, or that she cooked only with significant help from Mr. Crawford were unpersuasive.

Since the evidence in this case conflicts, more weight is given to Ms. Crawford's medical records than to her oral testimony.  The first symptoms of rheumatoid arthritis were not documented until Dr. Dower saw her for her routine visit three months after her vaccination.  Therefore, the undersigned finds that a preponderance of the evidence supports an onset date of January 5, 2015, for Ms. Crawford's painful and swollen joints.

## Conclusion

For the reasons explained above, the undersigned finds that Ms. Crawford first experienced pain and stiffness in her joints on January 5, 2015.  The parties are ordered to provide this ruling to any expert they retain.  If the expert's opinion is not consistent with these findings of fact, the opinion is likely to not be persuasive.  See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record.").

A status conference is set for **Wednesday, August 28, 2019, at 2:00 P.M. Eastern Time**.  Ms. Crawford should be prepared to propose the next step in this case.

**IT IS SO ORDERED.**

s/Christian J. Moran<br>
Christian J. Moran<br>
Special Master